Good morning. My name is John Gorman. I'm the federal public defender from Guam and I represent Mr. Rowland. There were initially two issues raised on appeals. One was our motion for the disclosure of the confidential informant. Frankly, that's not really a strong issue here. I'm going to rest on the pleadings. And what I would really like to talk to you about today is what the court has directed us to talk about. And that is whether this was a border search and what are the implications of Title V, Guam Code 73126. If we look at 71326, I think it makes this issue in this case rather easy to dispose of. Because the issue here is that this customs officer who stopped Mr. Rowland from going to Guam, and I'm going to talk to you a little bit more about that. Mr. Rowland on December 15, 2003, simply lacked the statutory authority to conduct this warrantless search. And since he lacked the statutory authority to conduct this search, all the evidence, all the observations that came out of this search must be suppressed. And that is the nervousness, the sweating, the blurred out confession, the consent for the pat down, and then of course the drugs. The government's position here is that this is a border search. The government ignores the Ninth Circuit's ruling in Comic-Con. And the language in Comic-Con is important. We do not treat passengers who travel through international airspace on a nonstop flight between two U.S. locations as having crossed our borders. Example, having entered the United States from a place outside thereof, and thereby subject to immigration inspections or border searches, as they would if the flight had originated in a foreign country. And that is the situation here. This is a nonstop domestic commercial flight from Honolulu to Guam. Clearly, we would argue on a broader scale that the customs cannot interview, cannot interrogate, cannot stop and seize passengers on that flight. But we don't even need, this court does not even need to go to the broader issue there. It can simply restrict itself to the more narrow issue of whether or not these officers even obeyed their own custom regulations. Because their own custom regulations, as the court is well aware, because the court has asked us to brief this issue or to address this issue here today, is that the customs examiner can examine baggage of any person arriving in Guam from a point outside the United States of America. And what CAVICON, and that's a June 6, 2003 case, tells us is that a flight, a nonstop commercial domestic flight from Honolulu to Guam is not a point outside the United States. Do they have any authority to examine luggage for vegetables or other kinds of things that are supposed to be not imported into Guam from even another island? Do they have any authority, like agricultural inspection? They do have authority. I would argue that they do have authority for coming from other islands. Let's say neighboring islands, Commonwealth of Northern Marianas, Palau, Micronesia, because those are points outside the United States. Let's say someone's coming from Hawaii, as was this case. Is there any agricultural inspection that's allowed? It could be, but it's not under the statute that they have. And I think it's important to remember there's an earlier Guam case, Baruch, that has some language, I think, which speaks to your question. Agricultural administrative searches, when considering challenges to agricultural and other administrative searches, courts need to determine whether the asserted administrative need to search is simply a pretense employed to justify a warrantless search for criminal law enforcement purposes. So we know what happened in this case, which was DEA had gotten a tip that Mr. Rowland was coming in. They communicated that to the customs and said, stop him. So there was no question that this was an agricultural or administrative search. This was pure and simple, and they admitted it. They told customs, stop him, we think he's carrying drugs. They stopped him? Exactly what happened? They stopped him and said what happened? It was a two-step process. There's a primary inspection when you come into Guam, so you walk up to that counter. He met with a Guam customs officer, Elvendia, I think. He walked up, Elvendia questioned him. There's a form that you fill out when you get off that flight from Honolulu. He filled out the form. He went up to Mr. Elvendia, who had received this. What's the form about? It asks a whole variety of things. It asks your name, address, date of birth, place of birth, passport number, where are you going to stay in Guam, where do you live usually. Also asks if you're carrying any prohibited substances, whether they're agricultural or controlled substances. Also talks about are you bringing over $10,000, are you bringing merchandise over that. So that form had been filled out prior. He walks up to the first officer. That officer questions him. Nothing incriminatory there. Based on the fact that DEA had told him, hey, hey, we're looking at this guy, and based on that only, he was then referred to the secondary inspection. How do we know that? Because there is no testimony that anything incriminating came out of that encounter. Well, I mean, the customs officer doesn't have to take that person's word for it. They can just say, all right, go over there, check it out. There's no dispute that the customs had been told to stop him. Absolutely. I believe there's no dispute. And there was no evidence at the hearing that was held on there that anything untoward happened at the first stop. And that's why he presented it like that. Let me ask you this. They got this tip from an informer in Guam, right? Yes. And then the Guamanian authorities checked this guy out. Is that right? Well, they went and talked to him. To some degree, yes. They went and talked to him. Yes. And they got some information from him. Some information. That he was on probation and all that. They knew that. They knew that. Sometimes it's hard to keep everything in mind at one time. They knew that. But he did say that he'd dealt with this guy before. He did say that, the tipster did. And the Guamanian authorities have any information that this person was involved in drugs. The tipster? No, no. All right. Your client. The tipster said he was involved in drugs. Yeah, but did they confirm that? No, in my opinion. What? No, in my opinion, no. Actually, Your Honor, the facts are important. They didn't check with the Honolulu authorities. They did check with the Honolulu authorities. They don't have to do that. They look in their computer, right?  Okay, they called Honolulu probation. Okay, well, he was on probation for something. Yeah. Okay. Well, why isn't that enough reasonable suspicion? I'll back up a little bit. The facts are important in this case. And they are important also because both the district court and the government hasn't got the facts straight. The facts are that on October 2003, this tipster contacted DEA in Guam. There was one 10-minute meeting and two to three other short telephone calls. This tipster told them he gave them a name, a physical description, and that Mr. Rowland was from Hawaii. And he also said that Mr. Rowland had dealt drugs before and was planning to come to Guam again, a date unknown. That was the only information this tipster provided. And then when we look at everything else here, and you look at page 90 of the excerpts of record, and that's where it becomes clear exactly because that's when the DEA officer was clear as to what information he got because he had been confused earlier. He said all the other biographical information that was more exacting such as his date of birth and his probationary status came from the Hawaii probation office. So we have very minimal information at that time given by the tipster. And this was a brief, limited contact that DEA has with this tipster. And it's important to note he gave no date for Mr. Rowland's arrival. So Mr. Rowland actually arrived on December 15th, so sometime at least two months later. And I would argue that that makes this tip stale. They admitted during the hearing they'd never used this person before or never gotten information. So he has absolutely, and they admitted, no track record of reliability for this information. The only thing they did in those two months was to call Hawaii probation. So I would argue they really made minimal efforts to confirm and follow up on this. The tipster said, yes, he's coming to Guam. But when you look at both Supreme Court and Ninth Circuit law, this predictive behavior saying so-and-so is going to come to Guam and saying so-and-so, here's kind of what he looks like, that is not enough. That does not rise to reasonable suspicion in terms of a tipster. Well, the tipster is saying that he had dealt with this, dealt with Rowland in the past. Yes. And again, now here is a problem. What did DEA, here's this information that DEA has. We have no information. Did they ever follow that up? What do you mean he had dealt with him in the past? In terms of what? What exactly did he do? And it's a little bit odd when you look at this further. The DEA agent says that he did it out of his own. He was concerned about the effect that drugs was having on the community in Guam. That's why he was coming forward. There's no information. They ever even looked at this tipster to see where did he get that information. They said, oh, he came forward. His only motivation was the good of the community. How did he know Mr. Rowland? How did he know what? How did he know Mr. Rowland? I think a common sense interpretation might be they were in business together. That's how he would know some of the details that he gave. So why did DEA never follow up at all when they were talking to this tipster as to what was the nature, what was the basis of his information? Because I think that would have gone to what was, who is this man and what was his motivation for giving this tip? But I would also like to argue and point out that even besides that, this evidence must be suppressed because when he showed up there at Guam, that customs officers, that stop, it lacked statutory authority. Everything they did was outside of their bounds and therefore. Yeah, but then he did go to the secondary, right? All part of the same process. Yeah, what happened over there? At the secondary, his luggage was searched and he was questioned further. The secondary officer said that he was sweaty and appeared nervous. And then he said, I want to pat you down. Do you have any drugs or weapons on you? And that's when my client made the admission, yeah, I have these drugs strapped to my body. Did he say, I want to pat you down, or did he say, do you have any drugs on you? He said, I'm going to pat you down. What did he say first? Do you have drugs? I believe from my memory of the transcript, and I can look at it to refresh it, that he said, I'm going to pat you down. Do you have any drugs or weapons on you? And that's when my client made the statement. I would argue, again, going back to my main position, is they simply lacked the statutory authority from day one, from the minute he walked up that booth, to stop him and search him. It says clearly in their own regulations, they're allowed to examine baggage and people coming outside of, well, we can mirror the exact language, arriving on Guam from a point outside the United States. So once they've exceeded their statutory authority there with that initial stop and seizure, and it was a stop and seizure, then I would argue everything must be suppressed. You know, I had a case, maybe it was, what year is this? Maybe it was, oh, 25 years ago, somewhere in there, where they involved Guam in a customs search. And I held that if you come to Guam from Hawaii directly, that that's not a border search. But I haven't been able to find it. Did you find it? I would love to find it. I haven't seen that. I know, but maybe it didn't involve drugs. Maybe it involved something else. But that was the issue. And I've got a good memory of stuff like that. Because I remember that pretty clearly. Well, I had searched and searched, but I haven't got it. But I'm continuing my search. It may be a district court case. I'm not sure. I'll have to, okay. All right, thanks. Your Honor, and although I didn't say it the first time, we'd like to reserve possibly a minute for the honor. May it please the Court, Karen Johnson, United States Attorney, appearing for the government of Guam, government of the United States. Counsel and I had, I confess, initially thought it amusing to set this up as a border search. Well, are you from Guam? Yes, Your Honor, I'm with the U.S. Attorney's Office in Guam. Okay. I'm representing the United States. We had posed the case as one of a border search. Judge Munson would have none of it. And as he pointed out in his hearing, he says, don't you think you have probable cause to stop this man and to search him? We said, yes, Your Honor, but we want to do it as a border search. He said, call your witnesses. And in fact, Agent Anderson got on the stand and established that we had ample reasonable suspicion to do a terry-type stop on this man. We had an unusual situation in that we didn't just get a tip. We had an informant come forward, and not only by telephone, but he personally met with the DEA. He gave them his name, and he met with them. I talked to them on two other occasions after that. So we have a named person, a named citizen, coming forward saying that he was dealing, he was tired of dealing ICE, tired of what it was doing to the community, and this was the information he had of Mr. Rowland, that he was from Hawaii, he gave a physical description, that he was bringing in ICE, and that he was on probation. And this man knew this personally from his personal dealings with Mr. Rowland. Well, if we were to accept that, let's turn to the authority of the individual at Customs. Did he have authority to arrest for drug violations? He had the authority to stop Mr. Rowland. He had reasonable suspicion to believe that a crime was being committed when Mr. Rowland came in the airport from Hawaii. That led to a legal stop. During the course of the stop, he asked him, and he did not say he was going to pass it. You're not quite answering exactly what authority did this Customs individual have. As I understand it, he had authority in respect to agricultural items and that kind of thing. No, Your Honor. The Customs statute, and this is Chapter 73, specifically gives any Customs authority, I'm referring now to 73-102. This is a Guam statute. This is a Guam statute. I assume that was your question, what power had the government of Guam authorized him. Yes, I want to know exactly what he could do. Chapter 73, pardon me, Section 73-102. Guam Customs authorities have the authority to arrest persons who violate the controlled substances law of Guam and to make seizures of any controlled substances imported into Guam in violation of the Guam Controlled Substances Act. This is the import. Is it limited to import? No, Your Honor. Import is not in the Cabocon case. This section and the laws and the regulations they're operating under are more than 50 years old. We cited, and this is at page 58 of the excerpts of record, Governor Skinner, back in 1952, gave at that time what they called the security officers. I think, let me see exactly what he called it. The Port Security Division, they did not have an airport back then, but all goods came in through the port, created a Port Security Division and gave those officers the authority to search, and I'm going to quote here, they had the authority, including but not limited, to the examination and inspection of persons and their baggage arriving in Guam. That was, the executive order passed in 1952. Yeah, but that's all based on the assumption that when you come to Guam, you know, that Guam is a foreign place. No, Your Honor. And that you're subject to a border search. Your Honor, Guam is an internal border. Congress specifically exempted Guam from the 1937 Tariff Act, thereby allowing it to set up its own customs authority, which it has done. The declaration that one must fill out when one comes into Guam from any place on the planet, included in the usual controlled substances, agriculture products, more than 10,000 cash, is you're required to list all of the goods that you have purchased abroad because they're going to impose a duty on it. When I brought in rugs from Hong Kong, I paid a duty. Yes, but that's not, that was from Hong Kong. If you came from Hawaii. I'm still coming there. When I remodeled my kitchen two months ago and I brought in kitchen cabinets from Home Depot, I paid a duty. Guam has its own customs border. It is an internal border which Congress allowed it to create, and all of the searches done at the airport, the declaration form that one must fill out, are pursuant to Guam's belief that it has its own customs border and is administering it. Well, you know, we've gone the other way on that. I'm sorry? I say, haven't our courts, this court, gone the other way on that issue? No, Your Honor, and U.S. v. Sugiyama specifically has affirmed that fact. The 1988 case cited in my brief, these very issues were raised, Governor Skinner's memorandum was quoted, and this panel, I should say, a panel of the circuit has held that Guam has its own border and that it may do border searches. What is, does Cabocabana, whatever, fit into that? Cabocabana, in my opinion, is irrelevant to this case because it concerns what constitutes the term importation for drugs moving from one U.S. jurisdiction to another. This, and the former Ninth Circuit law had been that importation occurred if you transported drugs over international waters, and the Cabocon case reversed the former Ninth Circuit law on that. This is an entirely different issue. This concerns Guam's authority to control what comes into its borders, either by the court or by the airport. And wherever it comes from, they require you to pay a duty on it, they require you to report it, and they have the legal authority to seize and arrest people for any violations of the controlled substances law of Guam. So we have this case that was decided in 1995 called U.S. v. Vance? Yes. And you're aware of that case? Yes, Your Honor. And we, you know, when the judge talks, I know you're all operating under different time zones, but so when we ask a question, you've got to hold your fire. I'm sorry. Yeah, okay. And we said then that a search at Guam Customs is a border search, and there the passenger arrived from Hawaii. Are we bound by that decision? I believe you are. Okay. Tell me exactly what the congressional authority is and the statute which says that Guam can maintain its own border in customs. Yes, Your Honor. That was discussed, and I hope I have that case with me. In the case out of the Virgin Islands, and here we go. A district court case gives the history of the 1937 terror. I thought you were talking about a statute. Is there a statute? Oh, no, Your Honor. Congress exempted Guam and the Virgin Islands from the 1937 Terror Act. Okay, now that should be a statute, is it not? But it's not a statute specifically affirmatively creating a Guam Customs border. Well, where does it say that Congress exempted Guam and the Virgin Islands from the Terror Act? Your Honor, the statute exempts it, and I'm trying to talk. I'm searching for your record. For the 2002 Westlaw 31682232, that's the government of Virgin Islands versus David, where they discussed the history of that, and I'm trying to find the U.S. Treasury Secretary's regulations that specifically provide that Guam is exempt from the tariff authority and can set up its own customs border. That's really very important to your argument, so I think you ought to be able to cite us to the statute and the regulations. I should, Your Honor, and I cannot find it as I'm talking. But the U.S. Secretary of the Treasury... Is it in your brief? It is in the cases that we cite in our brief. But you don't specifically cite this in your brief. I think I do. No, I do not cite the Virgin Islands case. I cite Sugiyama and Vance. I'm sorry. I do not cite the Virgin Islands case. It was a district court opinion. I believe it was cited in our lower arguments, but not in the appellate brief. So what are we supposed to do, scrounge around and all that stuff and figure out which argument it is? No, Your Honor, I think you need to abandon the border search argument because I think Judge Munson was right, first of all. Well, look, you know, this is a decision of our court. Yes. And it stands. Yes. Yeah, okay? Yes. And we can't abandon a decision of another panel. I agree, Your Honor. It doesn't work that way. So why do you tell me we should abandon our ruling? No, no, I'm sorry. That's not what I meant, Your Honor. I thought the judge was referring to our arguments. I do not think that this court reaches the border question because I think there's probable cause. In fact, there's reasonable suspicion to stop Mr. Rowland. And Judge Munson was right to decide it solely on that basis. If the court decides that there is not a reasonable suspicion, then I think we get to U.S. v. Vance and we have a third three-judge panel saying Guam has its border. It may do custom searches. All right. Well, that's a helpful statement. I'm sorry, Your Honor? That's a helpful statement. I'm complimenting you now. Your brief cites the CFR. Well, actually, I guess it's quoting from Sugiyama, which cites the CFR in which the Secretary says that the territories were not within the customs territory of the United States. Importation into those islands are not governed by the Terror Act of 1930 or these customs regulations. The Customs Administration of Guam is under the government of Guam. Yes. That apparently is in 19 CFR. Yes, sir. Thank you. Are there other questions? No. Okay. Thank you. You started your argument saying this is a Terry stop. Yes, Your Honor. And your position is that it was a Terry stop up to the point where he said, yes, if that drug is on there. Yes. And if I may, we submitted as exhibits the police reports. The way the colloquy went was that the secondary inspector checked the luggage and then he turned to the defendant and asked him if he had any weapons or drugs on him. He did not tell him that he was going to pat him down. He first asked, do you have any weapons or any drugs, and it were upon Mr. Rollins that I'm carrying drugs. That is the evidence that was submitted below. He did not first say he was going to pat him down. Okay. Well, you know, Guam statute just going back permits Guam customs agents to search baggage of any person arriving in Guam from a point outside the United States. Yes. Okay. And that doesn't authorize customs agents to search anyone who arrives in Guam from a point inside the United States. That is true, Your Honor. From Hawaii to Guam, you're coming from a point inside the United States. Right. I've looked at that entire chapter. It seems to be directed to the collection of duty and searching baggage and merchandise coming in by vessel. That is to say, and they define vessel as things moving upon the water. Guam basis is authority for the border search at the airport on Governor Skinner's executive order. When the Guam Customs and Quarantine Authority was segregated from the Commerce Department, Chapter 73, the prelude to it, specifically indicates that all other, I'm quoting now from Section B, that all other rules, regulations, and executive orders relative to customs and quarantine functions of Guam are to be implemented and enforced. And, of course, Governor Skinner's executive order is just that. The section they specifically cite versus baggage seems redundant to me because they already have that authority. So where does Skinner get his authority? From the Guam Organic Act and the authority of the governor. And what's the cite to that? It's 48. I have to check my brief. It's Title 48 and it's cited in Sugiyama. I always forget the exact statute. 48 of 1422. That is Section 6 of the- You're talking about the U.S. Code now. Yes, 48 U.S. Code, Section 1422 gives the governor of Guam the authority to execute orders and regulations not in conflict with any other applicable laws. Read that again. Section 6 of the Organic Act empowers the governor to execute, pardon me, to issue executive orders and regulations that are not in conflict with any applicable law. At the time that Governor Skinner issued this executive order in 1952, that in fact was the law, was the order setting forth the customs authority. And he did it through the Organic Act. Does it follow inevitably from the fact that Guam has customs authority that it can do criminal border search? I think they can do any sort of border search. The fact that it has its own independent border, it can treat its border like the border of any other country. It's exempted from our Tariff Act, but it doesn't say it has its own border. It's a territory of the United States. Yes. The District Court of the Virgin Islands case called it an internal border, which Congress allowed them to set up. And the Virgin Islands has the same statute, has the same procedure, I should say. But as they say, I don't think we reached this issue because they had good information Mr. Rollins would be carrying drugs when he came in from Hawaii. And Judge Munson, I think, was correct to decide the case on that basis. Your preferred method of proceeding is just to say this is a carry stop and we don't have to pull with a border search. I think that that is a... I don't know, that's one of your... Counsel and I have set this up as a border issue because we thought it would be interesting. But as they say, Judge Munson would have none of it, and I think he was correct. We have good, reliable, informant, reasonable suspicion to stop, and that's what they did. And we do not need to reach the border issue, and indeed Judge Munson did not. If we reach the border issue, then we have the Ninth Circuit authority now is that Guam had the authority to do this. You have the Ninth Circuit authority that does what? That Guam Customs had the authority to do this, and that's a Vance case. And you had the passenger coming in from Hawaii. I think that's enough. I think we have enough. Okay. Thank you. Thank you. All right. Two problems with the government's argument. One, they want to ignore the clear statutory language which says from places coming outside the United States that Islam Customs own regulations saying that they can only examine people arriving from a point outside the United States. The government does not. It doesn't say only. Sorry? It doesn't say only. No. It says they can examine people coming from outside. I would argue under CABACAN, however, and the government doesn't like CABACAN. And CABACAN made it clear, and CABACAN explicitly, when you look at CABACAN, overrules one of the cases that the government relies on, which is Sugiyama. And I believe CABACAN implicitly overrides Vance. Now, Vance was a 95 case, and when you look at Vance, and Vance did say that this was a border search. But when you look at that case, all parties, just from the common sense reading of it, it seemed all parties accepted that it was a border case. There's no real discussion of whether or not Guam has this alleged internal border system. All the discussion focused on the requirements for a strip search and acceptance of responsibility. And when you look at CABACAN, which is the language of CABACAN, the fact that it explicitly overrules Sugiyama and another case, Perez, and here's the language from CABACAN, to the extent that Sugiyama and Perez address the transport of drugs through international airspace on a nonstop domestic flight, they are overruled. So CABACAN is the place to start here. Vance is still good law, but I would argue it has been implicitly overruled by CABACAN. The government also looks towards this district court case from the Virgin Islands, and that is Virgin Islands versus David, that did uphold a similar type search. This was a person coming from Georgia into the Virgin Islands. But when you read David, you see it relies heavily on Sugiyama and Vance. So all this case law is not taking into account the changed legal atmosphere, which is CABACAN. The government says, oh, there is this internal border. I have yet to see the evidence of this internal border. The problem with Guam customs is unlike the federal government. The federal government has sovereign authority to protect its territorial integrity. The territory of Guam does not. It has no sovereign authority to prohibit the entry of its territory of anyone. And when you come to Guam from a foreign country, you will go through INS, and you will go through international controls. That's from a foreign country. The issue is here, coming from another part of the United States into America, does Guam have the power to set up these checkpoints? And I would argue no. And you can also look clearly at their own. What if you come from Tinian? Absolutely, they have the power. They got the power? I would argue yes. They're coming from a place outside of the United States. Tinian has a different political status. How about Saipan? Same position. Yes, they can from Saipan. But when you're coming from another part of the United States, Hawaii, they do not have that power. They don't have the power to prohibit anyone from coming into Guam. Any more than the state of California could set up a checkpoint at the border with Nevada and tell people they can't come in. That's part of the right to travel. It's a fundamental right under the Fourth Amendment and the Fourteenth Amendment and also under the Privileges and Immunities Clause. Even if she can cite the substatutory authority, it must fall to the constitutional question of can they prohibit and can they impede the ingress and ingress of people into Guam from another part of the United States. They cannot. And that's the reason she can't find any authority. Cabo Can is really the thing to look at here because, as I said, it overruled the cases that she relies on. Sugiyama in Paris explicitly overruled and Vance implicitly overruled. And she also cites the Virgin Island case, but, again, that's a district court case. It has no presidential value. And when you read it, you will see that relies on Sugiyama in Paris, which had been overruled by this court. One other brief issue regarding the Terry-type stop. Terry, the Supreme Court approved a limited search, a pat-down for weapons for the protection of the officer investigating suspicious behavior of people he reasonably believed to be dangerous. And it requires police officers to be able to point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant a belief that his safety or others' is in danger. My client got off a domestic commercial plane from Hawaii, where he had already gone through screening. Much more vigorous screening than even to get into this courtroom. There is no basis for a Terry stop here. There is no reasonable allegation that he got off that flight from Hawaii to Guam carrying weapons. We know what happened in this case. DEA made a call to Guam Customs that said, Stop him. We think he's carrying drugs. They are statutorily prohibited from doing that. I just wanted to bring one case to your Honor's attention that I think is important. I didn't have time to file it with the court. I had just come back from vacation when I received the notice from the court. Well, we have these gum sheets. You can write all this out on the gum sheet. And give it to the court? Yeah. But there is, of course, Mendoza-Ortiz from 2001, which talks, I believe, is on point regarding a custom search. And because the customs agents lacked the statutory authority to conduct the warrantless search, the evidence was suppressed. All the impressions and the evidence was suppressed. And this is exactly the situation here. They had no statutory authority to conduct the search. All right. So both of you, I mean, there have been citations to authorities that are not easily found within your briefs. You can both get some gum sheets and put whatever you want on it. There's only one that I have cited, just the last case, Your Honor. I apologize. That's part of our consumer-friendly operation. All right. Thank you. Thank you very much. Have a good safe trip home. We're going to take a ten minute break.
judges: B. Fletcher, Pregerson, Canby